UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Marc Amouri Bakambia,                                    Civ. No. 20-1433 (PAM/TNL)

                    Plaintiff,

v.                                                       **MEMORANDUM AND ORDER**

Paul P. Schnell; Vicki Janssen;
Paul Gammel and Kenneth Peterson,
sued in their individual and official
capacities; David Schmitt; Scott
Maki; Jesse Pugh; Clemons;
E. Rasmussen; Gary Peterson;
Tyler Nelson; and Tatum;

                    Defendants.

---

This matter is before the Court on Defendants' Motion for Summary Judgment. (Docket No. 166.)  Related to this Motion, pro se Plaintiff Marc Amouri Bakambia has filed a letter requesting leave to supplement his opposition to Defendants' Motion with the declaration of a fellow inmate.  (Docket No. 187.)  For the following reasons, Defendants' Motion is granted and Plaintiff's request is denied as moot.

**BACKGROUND**

Plaintiff brings this action under 42 U.S.C. § 1983 for alleged violations of his constitutional rights while he was confined at MCF-Rush City, a state prison, in May 2019. (See generally Am. Compl. (Docket No. 45); see also May 17, 2021, Order (Docket No. 115) at 1-2; Oct. 22, 2021, Order (Docket No. 140) at 1.))  In brief, Plaintiff alleges that during two incidents in May 2019, he "sustain[ed] several injuries, including a

traumatic brain injury, fractured bones, and post-traumatic stress disorder." (Docket No. 140 at 1.) Plaintiff raises two claims: that Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment and that they discriminated against him "on the basis of his custodial status" and national origin in violation of the Fifth and Fourteenth Amendments. (Id.; see Am. Compl. ¶¶ 64, 68-70.)

Defendants are or were employees of the Minnesota Department of Corrections ("DOC") when the incidents occurred, some of whom worked at MCF-Rush City. Although Plaintiff purports to sue Defendants in their official capacities, he has made no official-capacity arguments. Thus, the Court will consider only Plaintiff's individual-capacity claims. (See, e.g., Am. Compl. ¶¶ 10-21.)

Plaintiff is a citizen of the Democratic Republic of the Congo and a lawful permanent resident of the United States. (Bakambia Opp'n Decl. (Docket No. 183) ¶ 1.) He is serving a sentence of 360 months after pleading guilty to second-degree murder. (See generally State v. Bakambia, No. 19HA-CR-14-3183, (criminal judgment & warrant of commitment) (Index # 111).)[1] Plaintiff was incarcerated at MCF-Rush City between April 2018 and July 2019. (Gammel Decl. (Docket No. 168) ¶ 2.)

## A.    May 20 Incident

On the afternoon of May 20, 2019, a fight broke out between Plaintiff and inmates J.B., Z.N., and C.W. on the prison's upper level. According to Plaintiff, C.W. asked whether Plaintiff would perform tattoo work, as he had done earlier that month on J.B., and

---

[1]    The documents from Plaintiff's criminal proceedings in Dakota County, Minnesota, are publicly available.

Plaintiff refused.  (Bakambia Opp'n Decl. ¶ 4.)  C.W. left and came back with J.B. and Z.N., and Z.N. punched Plaintiff.  (Id. ¶ 4.)  Plaintiff then punched Z.N., who went to the ground, while Plaintiff, C.W., and J.B. continued fighting.  (See Gammel Decl. ¶ 9.)  When Defendant Tyler Nelson noticed Plaintiff punching someone, he activated the Incident Command System ("ICS") and staff responded.  (Id. Ex. 1 at 1.)

At one point, J.B. was punching Plaintiff and chasing him down a corridor between a wall of cells and a railing above an open area.  (Id. ¶ 9.)  Plaintiff subsequently bent down to pick up J.B. and hoisted him up and over the railing, essentially throwing him down to the level below.  (Id.)  J.B. caught himself on the lower part of the railing before dropping down to the level below "without apparent injury."  (K. Peterson Decl. (Docket No. 170) ¶ 2.)  Nelson subsequently radioed that an inmate had been "thrown over the railing." (Gammel Decl. Ex. 1 at 3.)  Nelson and other MCF-Rush City staff members sprayed chemical irritant and gave commands to stop fighting and get down on the ground.  (See id. at 1, 5, 9.)

### 1.    Segregation

The segregation unit at MCF-Rush City is split into four sections, which are "separated from each other and [inmates] cannot pass through at their discretion."  (K. Peterson Decl. ¶ 4.)  Immediately following the incident, unnamed MCF-Rush City corrections officers escorted Plaintiff to the Upper A-Wing of the segregation unit. (Gammel Decl. Ex. 1 at 13.)  On his way to the segregation unit, Plaintiff reported to an unidentified MCF-Rush City corrections officer escorting him that he had been attacked

3

by the same people a few days ago.[2]  (Bakambia Opp'n Decl. ¶ 7; see Gammel Decl. Ex. 1 at 12 ("someone entered [Plaintiff's] cell and punched him").)

Initially, staff could not locate J.B.  (K. Peterson Decl. ¶ 2.)  Gammel reviewed the surveillance footage and determined that J.B. had been thrown over the railing.  (Gammel Decl. ¶ 6.)  Subsequently, Peterson and other MCF-Rush City staff members escorted him to the Upper B-Wing of the segregation unit about 10 minutes after Plaintiff arrived in the Upper A-Wing.  (K. Peterson Decl. ¶ 2.)

Shortly thereafter, Gammel and Nelson reviewed video surveillance and determined that Z.N. and C.W. were also involved in the fight.  (Gammel Decl. ¶ 7.)  Gammel directed that Z.N. and C.W. be placed in the segregation unit, and the men were escorted there.  (Id. Ex. 1 at 1.)  About 30 minutes later, C.W. and Z.N. arrived in segregation and were placed in the Upper A- and Upper B-Wings, respectively.  (Id. ¶ 7.)  Thus, Plaintiff and C.W. were both placed in the Upper A-Wing, separated by five cells.[3]  (K. Peterson Decl. ¶ 5.)

---

[2]     Plaintiff alleges that he told Nelson on the way to segregation that he was previously attacked by the same people.  (Am. Compl. ¶¶ 24, 37.)  The uncontroverted evidence, however, is that Nelson was not involved in escorting Plaintiff to the segregation unit. (Gammel Decl. Ex. 1 at 1, 12, 13, 14.)  The record is devoid of any evidence that Plaintiff reported anything regarding events on May 18 to anyone before May 20.

[3]     It is disputed whether four or five cells were open at the time the men were brought to the segregation unit.  Defendants assert that four cells were available (K. Peterson Decl. ¶ 7 (reviewed DOC records and found 4 open cells); Maki Decl. ¶¶ 5, 7 (four available cells)), while Plaintiff contends that cell 208 next to him was empty.  (Pl. Ex. 22 (Docket No. 184-3) at 1.)  Regardless, whether another cell was empty does not have any material effect on Plaintiff's claims.

According to Defendants Paul Gammel and Kenneth Peterson, MCF-Rush City staff did not know of any animosity between the men involved.[4]  (Gammel Decl. ¶ 10; K. Peterson Decl. ¶ 3.)  Defendants Scott Maki and Peterson and both described the aftermath of the May 20 incident as a state of urgency and confusion based on:  (1) the number of inmates involved; (2) J.B. having been thrown over the railing off the second tier and initially unaccounted for; (3) the originally unknown and subsequent determination of the involvement of Z.N. and C.W.; and (4) the capacity of the segregation unit.  (K. Peterson Decl. ¶ 9 (describing the scene as "very chaotic"); Maki Decl. (Docket No. 169) ¶ 4.)

### 2.    Segregation Policy

The DOC's Directive entitled "Segregation Unit Management" requires correctional facilities to develop and maintain admission procedures for inmates, including, among other things, a "status review of incompatibility," but the Directive does not define such a review or the criteria for incompatibility.  (Pl. Ex. 15 (Docket No. 184-2) at 2.) Defendants put forth no evidence that such a review occurred here.

When assigning inmates to cells in the segregation unit, MCF-Rush City staff consider the prison's security, inmate safety, and available bedspace.  (K. Peterson Decl. ¶ 6; see Pl. Ex. 22 (Docket No. 184-3) at 1 ("We can only use the bed space we have when guys come into seg.  You and [C.W.] were at separate ends of the tier.").)  According to Peterson and Maki, the cell to which an inmate is assigned in segregation does not bear on inmate safety or MCF-Rush City security.  (K. Peterson Decl. ¶ 6; Maki Decl. ¶ 5).

---

[4]    Two Defendants, Kenneth and Gary, share the last name Peterson.  Unless otherwise noted, all subsequent references to "Peterson" indicate Kenneth Peterson.

MCF-Rush City typically treats inmates brought to segregation for fighting as if "they had all fought each other" because staff often cannot "immediately discern" which inmates fought with each other. (Maki Decl. ¶ 4.) "Staff escorting [inmates] to segregation typically inform staff if they have knowledge that an [inmate] should not be out of his cell with another [inmate]." (Id. ¶ 2.) The segregation unit maintains a roster of the inmates, and any information regarding incompatible inmates can be indicated on the roster. (Id. ¶ 4; K. Peterson Decl. ¶ 8.) Maki does not recall whether any staff escorting the men "informed any of the segregation staff that any of them should not be out of their cell[s] with others." (Maki Decl. ¶ 4.) Plaintiff offers no evidence suggesting that he or anyone else indicated as much.

When inmates are brought to the segregation unit, staff gives them an intake manual containing the rules for the unit. (Id. ¶ 6; K. Peterson Decl. ¶ 6.) The manual states, in part, that inmates "with verifiable safety concerns based upon where they are housed within the segregation unit are encouraged to notify the Sgt/OIC and/or the segregation lieutenant immediately so the concern can be reviewed." (K. Peterson Decl. Ex. 2 at 3.) No evidence suggests that Plaintiff raised any such concern.

**B.      Discipline**

**1.      Discipline Policy & Rules**

"When an [inmate] is transferred to segregation . . . the discipline lieutenant reviews evidence, including incident reports and any video, along with a discipline sergeant to determine whether disciplinary charges should be brought against a particular individual." (Id. ¶ 13.) "Any offender who does an act which is a step toward the violation of a rule is

guilty of an attempt to violate that rule and is subject to the full penalty for that rule." (Id. Ex. 4 at 6.) If the discipline lieutenant determines that charges are warranted, staff delivers a notice of violation to the inmate. [5] (Id. Ex. 3 at 3-4; Id. ¶ 13.) Inmates may choose to admit to the violation and waive the right to a disciplinary hearing. (Id. Ex. 3 at 5.) Disciplinary staff may decide to extend a waiver offer to an inmate "which, if the [inmate] accepts, would result in less discipline than could be given under the [DOC's] Offender Discipline Rules if the matter proceeds to a discipline hearing." (Id. ¶ 3.).

### 2. Plaintiff's Discipline for May 20 Incident

Plaintiff received a notice of violation for the May 20 incident, for which he was charged with several rule violations: one count of disobeying a direct order; two counts of fighting; one count of possession of contraband;[6] two counts of inmate assault; two counts of attempted inmate assault with bodily harm; and two counts of attempted homicide. (Id. Ex. 5 at 1.) Plaintiff received a waiver offer, which he accepted. (Id. at 3-4.) Plaintiff received 60 days of segregation for one count of fighting; 60 days of segregation for one count of inmate assault; 90 days of segregation for one count of attempted inmate assault with bodily harm; and 90 days of segregation for one count of attempted homicide, all to run concurrent. (Id.) The contraband was confiscated, and the remaining counts withdrawn. (Id.)

---

[5]     To the extent Plaintiff's submission can be read as asserting a claim for failure to investigate, such a claim is not asserted in the Amended Complaint and, thus, will not be addressed.

[6]     The record does not state what constituted the contraband.

### 3.     J.B., Z.N. & C.W.'s Discipline for May 20 Incident

J.B. and Z.N. received penalties of 70 and 65 days in segregation, respectively, "for inmate assault and other violations for which the penalties imposed were shorter in duration and ran concurrently."  (Id. ¶ 15.)  C.W. "received a penalty of 60 days in segregation for fighting, and a shorter, concurrently run, penalty for disorderly conduct."  (Id.)

## C.     May 21 Incident

### 1.     Recreation Time

Each segregation unit has its own recreation session.  (Id. ¶ 8.)  Typically, inmates in the segregation unit receive two 30-minute opportunities for recreation time outside of their cells each day.  (Id. ¶ 8.)  Inmates "who do not wish to come out for the first 30 minutes of recreation time typically cannot come out of their cell[s] for the second 30 minutes of recreation time" except to shower.  (Schmitt Decl. ¶ 6.)  MCF-Rush City staff inquire whether each inmate would like to come out for recreation time, and make notes accordingly, so they can unlock the inmates' cells at the start of recreation.  (Id. ¶ 5.)  "If an [inmate] does not wish to come out for recreation time for any reason, he may remain in his cell with the door secured during recreation time."  (Id.)  The record does not reflect that staff raised any concerns to Defendant David Schmitt regarding Bakamabia and C.W. sharing recreation time, as policy would have required.  (Id. ¶ 10.)

### 2.     Plaintiff Attacked in Segregation

There were two sessions of recreation time during the afternoon and early evening of May 21 in the Upper A-Wing.  (Id. ¶¶ 10, 11.)  Approximately six inmates participated in the first section of recreation, including Plaintiff and C.W., who "did so without

incident." (Id. ¶ 10.)  Plaintiff maintains that he does not recall seeing C.W. during the first recreation period, but MCF staff explained that Plaintiff would have seen C.W. because C.W.'s cell was opened first.  (Bakambia Opp'n Decl. ¶ 8; Schmitt Decl. ¶ 11.)

Both Plaintiff and C.W. chose to participate in the second recreation session on May 21.  (Schmitt Decl. ¶ 11.)  Shortly after recreation time began, C.W. and two other inmates approached Plaintiff from behind and two of the men began punching Plaintiff while the third stepped off to the side.  (Pl. Ex. 6 (Docket No. 184-1) at 076, 077, 080; see Gammel Decl. Ex. 3 at 1.)  While the two men continued punching and kicking Plaintiff on the ground, the third man began fighting with another inmate.  (Pl. Ex. at 076, 077, 078, 079, 080; see Gammel Decl. Ex. 3 at 1.)  The other two men subsequently joined the fight with the other inmate.  (Id.)  Schmitt, Gammel, and other MCF-Rush City staff members responded to the incident.  (Gammel Decl. Ex. 3.)

Additional facts surrounding these events will be incorporated into the discussion below, as necessary.

**ANALYSIS**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The Court must view the evidence and inferences that "may be reasonably drawn from the evidence in the light most favorable to the nonmoving party."  Enter. Bank v. Magna Bank of Mo., 92 F.3d 743, 747 (8th Cir. 1996).  The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A party opposing a properly supported

motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  A dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party.  Paine v. Jefferson Nat'l Life Ins. Co., 594 F.3d 989, 992 (8th Cir. 2010).[7]

## A.   Individuals Without Personal Involvement

Defendants Paul Schnell, Vicki Janssen, Deneen Clemons, Jesse Pugh, Branden Tatum, Gary Peterson, and Erik Rasmussen were not involved in the May 2019 events.  At the time of those incidents, Defendants Schnell and Janssen held positions outside of MCF-Rush City—Schnell was the Commissioner of Corrections and Janssen was the warden at a different state correctional facility.  (Gammel Decl. ¶ 3.)  Plaintiff alleges that he complained to Schnell and Janssen in July and August of 2019.

Supervisor liability is limited in § 1983 actions.  Ottoman v. City of Independence, 341 F.3d 751, 761 (8th Cir. 2003).  "[A] supervisor incurs liability for an Eighth Amendment violation when the supervisor is personally involved in the violation or when the supervisor's corrective inaction constitutes deliberate indifference toward the violation."  Boyd v. Knox, 47 F.3d 966, 968 (8th Cir. 1995).  The theory of respondeat superior does not apply to an employee's actions in a § 1983 case.  Id.  Thus, Plaintiff's complaints to Schnell and Janssen after the events of May 2019 do not amount to any

---

[7]   Because Plaintiff has not established his constitutional claims, the Court need not determine whether any Defendant is entitled to qualified immunity on those claims.  It is likely, however, that all Defendants are entitled to qualified immunity as to all of Plaintiff's claims.

constitutional violation on their part.

Likewise, Plaintiff's tangential exchanges with Clemons, Pugh, Tatum, Gary Peterson, and Rasmussen after the two fights do not constitute violations of Plaintiff's constitutional rights. Plaintiff claims that in July 2019, he requested that Clemons investigate an incident from May 18, 2019, and that Clemons did not do so. (Am. Compl. ¶ 41.) However, Plaintiff raises no failure-to-investigate claim. Further, Plaintiff alleges that Tatum told another inmate after the May 2019 events that "that mother f***er right there can really throw you off the tier," referring to Plaintiff. (Pl.'s Opp'n Mem. (Docket No. 182) at 6.) This comment, however distasteful, was not a violation of Plaintiff's constitutional rights. According to Plaintiff, Pugh's only involvement was that in June 2019, Pugh denied him a transfer and ordered him to stop sending internal requests. (See Am. Compl. ¶¶ 34-36, 57-58.) Plaintiff alleges that in October 2019, Rasmussen responded to a complaint he made and instructed him to stop sending internal requests after he was transferred to a different facility. (Id. ¶¶ 55-59.) These interactions, which took place after May 21, 2019, do not constitute violations of Plaintiff's rights.

Lastly, according to Plaintiff, Gary Peterson signed the waiver offer as both the discipline staff and witness, and "threatened [him] to take the 90 days in segregation or it w[ould] go higher if [he] refuse[d]." (Bakambia Opp'n Decl. ¶ 46.) Plaintiff alleges that Gary Peterson threatened him regarding the discipline he received following the May 20 encounter, but the record is devoid of any evidence supporting this allegation, other than Plaintiff's own account. See Reed v. City of St. Charles, Mo., 561 F.3d 788, 790-91 (8th Cir. 2009) ("A plaintiff may not merely point to unsupported self-serving allegations, but

must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor.") (quotation omitted).  The record is unclear as to who delivered the notice of violation to Plaintiff on May 21, because the deliverer's signature is illegible.  (K. Peterson Decl. Ex. 5 at 2.)  Regardless, there is no material fact in dispute as to whether Gary Peterson violated Plaintiff's rights.

There is no evidence in the record demonstrating that these Defendants were personally involved in the events of May 20 or 21, 2019, and Defendants' Motion is granted as to Schnell, Janssen, Clemons, Pugh, Tatum, Gary Peterson, and Rasmussen.

**B.    Failure to Protect**

Defendants argue that they are entitled to summary judgment because no reasonable jury could determine that Maki, Gammel, Peterson, Schmitt, and Nelson were deliberately indifferent to a substantial risk of harm to Plaintiff regarding to events of May 20 and 21, 2019.  The Eighth Amendment's restriction "against cruel and unusual punishment requires prison officials to 'take reasonable measures to guarantee' inmate safety by protecting them from attacks by other prisoners."  Young v. Selk, 508 F.3d 868, 871 (8th Cir. 2007) (quoting Farmer v. Brennan, 511 U.S. 825, 832 (1994)).  "Prison inmates have a clearly established Eighth Amendment right to be protected from violence by other inmates." Curry v. Crist, 226 F.3d 974, 977 (8th Cir. 2000).  But "prisons are inherently dangerous environments."  Vandevender v. Sass, 970 F.3d 972, 976 (8th Cir. 2020).  "[N]ot . . . every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety."  Farmer, 511 U.S. at 834.

A failure-to-protect claim has both an objective and subjective component. Patterson v. Kelley, 902 F.3d 845, 851 (8th Cir. 2018).  Under the objective component, the question is "whether the situation presented a substantial risk of serious harm." Jackson v. Everett, 140 F.3d 1149, 1151 (8th Cir. 1998).  To satisfy the subjective component, "the inmate must show that the defendant official acted with a 'sufficiently culpable state of mind.'" Kulkay v. Roy, 847 F.3d 637, 643 (2017) (quoting Farmer, 847 F.3d at 834).  "The defendant-official's state of mind must be measured by the official's knowledge at the time in question, not by hindsight's perfect vision." Id. (quotation omitted).  "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety." Farmer, 511 U.S. at 837.  Indeed, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." Id.  In the context of failure to protect claims, "[d]eliberate indifference . . . means that prison officials subjectively knew of and disregarded [the inmate's] safety risk." Axelson v. Watson, 999 F.3d 541, 546 (8th Cir. 2021) (quoting Smith v. Ark. Dep't of Corr., 103 F.3d 637, 644 (8th Cir. 1996)).

"Deliberate indifference is a stringent standard of fault." Cox v. Sugg, 484 F.3d 1062, 1066 (8th Cir. 2007) (quotation omitted).  "[M]ere negligence or inadvertence" does not suffice. Kulkay, 847 F.3d at 643.  "Th[e] requisite state of mind is akin to recklessness, which is more blameworthy than negligence, yet less blameworthy than purposefully causing or knowingly bringing about a substantial risk of harm serious harm to the inmates."  Lenz v. Wade, 490 F.3d 991, 995 (8th Cir. 2017) (quotation omitted).

13

"[C]onstructive knowledge, or the 'should-have-known' standard, is not sufficient to support a finding of deliberate indifference."  Spruce v. Sergeant, 149 F.3d 783, 786 (8th Cir. 1998) (citing Farmer, 511 U.S. at 837).   At the same time, "[a] party need not necessarily show that the actor actually knew of the substantial risk of harm to an inmate;" but such knowledge can be inferred "if the risk was obvious."  Letterman v. Does, 789 F.3d 856, 862 (8th Cir. 2015).

### 1.      Substantial Risk of Serious Harm

As to the objective prong, Defendants first assert that Plaintiff was not exposed to a substantial risk of harm by placing C.W. in the same segregation unit, because staff control when offenders may be out of their cells, and can control their movements when that is so. While it may be true that prison officials can exert more control in that context, as evidenced by the events of May 21, fights between inmates can occur in segregation.  This argument is unpersuasive.

Defendants next assert that there was no substantial risk of serious harm because Plaintiff and C.W. participated in recreation time earlier in the day on May 21 and did not have any problems.  (Schmitt Decl. ¶ 11.)  Indeed, in Peterson's 18-year tenure with the DOC, he is "not aware of a situation like the one in this case where [inmates] who fought the previous day fight during recreation time in the segregation unit the following day." (K. Peterson Decl. ¶ 10.)  Likewise, Plaintiff presents no evidence that such an incident has previously occurred in the segregation unit.

Further, Defendants argue that Plaintiff did not inform staff that he was concerned about his safety in the segregation unit and that he could have chosen not to participate in

14

the subsequent recreation time that day.  Plaintiff claims that he "became aware of the presence of [C.W.] being in the same wing (tier) . . . only during the attack and after the fact, on second half flag (recreation)," but MCF-Rush City staff stated that Plaintiff would have seen C.W. during the first recreation time.  (Bakambia Opp'n Decl. ¶ 8; Schmitt Decl. ¶ 11.)  At this stage of the proceedings, however, and drawing all reasonable inferences in favor of Plaintiff, the Court will credit his assertion that he was not aware that he and C.W. had been confined in the same segregation unit.  Regardless, whether Plaintiff saw C.W. before the second session of recreation that day is immaterial.

Defendants also liken this case to Andrews v. Siegel, 929 F.2d 1326 (8th Cir. 1991), asserting that C.W. and Plaintiff did not have a contentious history before or after the May 2019 incidents.  In that respect, Andrews is similar to the facts at hand.  See id. at 1331 ("this was not a case where there was a history over a considerable period of time of hostility and violence by one inmate to another").  Yet, as Plaintiff counters, the parties in Andrews only engaged in a verbal argument previously, which "did not portend any violence by [the inmate] against Andrews or warrant any action by prison authorities to protect Andrews from [the inmate]."  Id. at 1330.  But the instant situation differs from Andrews significantly in that the MCF-Rush City staff immediately took action to separate Plaintiff and his attackers.  In Andrews, the prison staff took no action, yet Andrews and his attacker were allowed to work together with sharp tools the next day.  And despite that, the Court of Appeals determined that the prison staff was not deliberately indifferent.  So too here.

15

Plaintiff has not put forth sufficient material facts in dispute indicating that he faced a substantial risk of serious harm due to C.W.'s assignment to the same segregation unit. Therefore, Defendants' Motion as to Plaintiff's failure-to-protect claim is granted.

### 2.   Deliberate Indifference

Even if there was a genuine dispute of material fact as to whether a substantial risk existed, Plaintiff fails to point to any disputed material fact as to whether the Defendants exhibited deliberate indifference.  As to the subjective prong, the Court examines Maki, Gammel, Peterson, Schmitt, and Nelson individually.

### a.   Maki

Maki was the officer-in-charge of the segregation unit at the time Plaintiff, J.B., C.W., and Z.N. arrived.  (Maki Decl. ¶ 2.)  Officers-in-charge oversee the unit and its officers.  (Id.)  "Officers working in the units can approach the officer-in-charge with any questions or concerns they have, including any concerns regarding an [inmate]."  (Id.)  Likewise, inmates can relay any concern to an officer, who can then alert a sergeant or officer-in-charge.  (Id.)  Maki does not recall Plaintiff "saying anything to [him] about being concerned for his safety or being concerned about his cell placement," nor does he recall "any officers working the segregation unit informing [him] that [Plaintiff] raised any concerns."  (Id. ¶ 6.)  Maki does not recall whether he played a role in assigning cells that day or whether staff escorting the men involved in the fight informed Maki as to whether any of the men should not have recreation time together.  In an internal prison request dated July 14, 2019, Maki told Plaintiff that the individuals involved in the May 20 incident were "dispersed throughout the unit very well" and "only 1 [of them] had to be placed in the

same wing as you."  (Pl. Ex. 22 (Docket No. 184-3) at 1.)

Based on the foregoing, a reasonable factfinder could conclude that Maki knew on May 20 that C.W. was placed in the same segregation unit as Plaintiff.  However, nothing in the record suggests "that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past," such that Maki's exposure to information regarding Plaintiff and C.W.'s cell assignments in segregation rises to deliberate indifference.  Farmer, 511 U.S. at 842-43 (internal quotation marks omitted).  Moreover,  prison officials are bound by the "practical limitations" of their jobs, such as securing the facility in the aftermath of a violent incident between multiple inmates. Letterman, 789 F.3d at 862.

Plaintiff's implied argument, that inmates who fight can never be placed in the same segregation unit, belies reason.  Indeed, Plaintiff points to no authority suggesting as much. The record contains no evidence of any threat to Plaintiff before the May 20 incident or any continuing threat to Plaintiff once he was placed in segregation and before he was attacked on May 21.  Thus, Plaintiff's attempt to liken his situation to that of "plac[ing] . . . [him] in a cell that has a cobra" falls flat.  Jensen v. Clarke, 94 F.3d 1191, 1197 (8th Cir. 1996) (quoting Billman v. Indiana Dept. of Corrections, 56 F.3d 785, 788 (7th Cir. 1995)). Even viewing the evidence in the light most favorable to Plaintiff, a reasonable factfinder could not conclude that Maki was deliberately indifferent to a substantial risk of serious harm to Plaintiff.

### b.    Gammel

Gammel was working as "the watch commander" on May 20 and 21, a role in which he was charged with supervising the operations of MCF-Rush City, including security. (Gammel Decl. ¶¶ 4, 11.)  "All staff report to the watch commander" who "reviews incident reports as the[y] come in, . . . answers questions and addresses concerns as they arise," and "assigns various duties among facility staff."  (Id. ¶ 4.)  Thus, on the evening on May 20, consistent with DOC policy, Gammel, acknowledged that day's incident reports.

Plaintiff has alleged that Gammel was responsible for C.W.'s placement in the same segregation unit, but Gammel was not involved in assigning cells in segregation.  (Id. ¶ 7.) Plaintiff further alleges that Gammel "refused to review Plaintiff's placement in segregation."  (Am. Compl. ¶¶ 25, 27.)  Yet, Plaintiff has not put forth evidence that he sought anyone's review of his placement in the same segregation unit as C.W. before the May 21 incident.  Well after the May 21 incident, in response to an internal request Plaintiff sent to Gammel regarding why he and C.W. were placed together, Gammel responded that "[t]he [inmate Plaintiff was] involved in the fight with was secured in a different wing." (Pl. Ex. 27 (Docket No. 184-3) at 1.)

As stated above, supervisory liability is limited in § 1983 actions, such that a supervisor can only incur liability "when the supervisor's corrective inaction constitutes deliberate indifference toward the violation."  Ottoman, 341 F.3d at 761 (citing Choate v. Lockhart, 7 F.3d 1370, 1376 (8th Cir. 1993)).  Because Gammel was not involved in assigning cells in the segregation unit, Defendants contend Gammel did not know where Plaintiff and C.W. were housed in the segregation unit.  However, the incident reports that

18

Gammel reviewed included Plaintiff and C.W.'s cell numbers in the segregation unit. Gammel also helped identify C.W. as one of the men involved in the May 20 fight. But as with Maki, mere exposure to information that Plaintiff and C.W. were placed in the same segregation unit, without any further indication of danger from Plaintiff or other MCF-Rush City officials, does not equate to a supervisor "turn[ing] a blind eye for fear of what he . . . might see," as contemplated by Ottoman. Id. (quotation omitted). Maki's conduct does not rise to the level of recklessness that is required to establish deliberate indifference. Defendants' Motion is granted as to Maki.

### c.    Kenneth Peterson

Peterson observed other MCF-Rush City corrections officers escorting Plaintiff to segregation following the May 20 fight, and later Peterson helped escort J.B. to the Upper B-Wing of the segregation unit. (K. Peterson Decl. ¶ 2.) According to Gammel and Peterson, MCF-Rush City staff did not foresee such a fight or know of any animosity between the men involved. (Gammel Decl. ¶ 10; K. Peterson Decl. ¶ 3.) Peterson did not work in the segregation unit on May 21. (K. Peterson Decl. ¶ 10.) No facts suggest that Peterson was deliberately indifferent toward Plaintiff; thus, Defendants' Motion is granted as to him.

### d.    Nelson

Nelson activated and took command of the ICS on May 20 in response to the first incident and responded to that fight. (Id. Ex. 1 at 1.) He also reviewed video of the fight with Gammel and determined that Z.N. and C.W. were involved. (Id. ¶ 7.) While Plaintiff alleges that he told Nelson on the way to segregation that he had been previously assaulted

by J.B., Z.N., and C.W., the undisputed evidence is that Nelson did not escort him.  (See id. Ex. 1 at 1, 12, 13, 14.)  The record is unclear as to whether Nelson knew of Plaintiff and C.W.'s cell assignments.

The evidence does not permit a reasonable inference that Nelson subjectively understood that Plaintiff was at a substantial risk of serious harm and recklessly disregarded that risk, or that he was even exposed to facts revealing that Plaintiff was at risk.  See Farmer, 511 U.S. at 844.  Therefore, Defendants' Motion is granted as to Nelson.

###    e.    Schmitt

Plaintiff alleges that Schmitt permitted Plaintiff and C.W. to have recreation time together on May 21, when the second incident took place.  Schmitt was the sergeant assigned to the segregation unit that day.  (Schmitt Decl. ¶ 3.)  However, Schmitt did not work on May 20 and was not aware that of the altercation between Plaintiff and C.W.  (Id. ¶ 4.)  Moreover, Schmitt was not involved in implementing recreation time and was not present for the first session of recreation on May 21.  (Id. ¶ 10.)  No evidence suggests that Schmitt was aware of any concerns relayed by MCF-Rush City staff after the first recreation session, and Plaintiff points to no facts suggesting that anyone relayed any such concerns.  Indeed, the second incident between Plaintiff and C.W. during the second session of recreation "came as a surprise" to Schmitt.  (Id. ¶ 11.)  Thus, the evidence does not permit a reasonable inference that Schmitt subjectively understood that there was a substantial risk of serious harm to Plaintiff from C.W. and recklessly disregarded that risk, or that he was exposed to facts revealing such a risk.  Defendants' Motion is granted as to Schmitt.

### f.   Conclusion

In sum, Plaintiff provides no evidence demonstrating a history of conflict with C.W. or any of the other involved inmates.  Similarly, Plaintiff fails to provide evidence that any of the inmates with whom he fought had a history of violent attacks in prison.  Further, Plaintiff produces no evidence that he was fearful for his safety before the May 21 incident, as evidenced by participating in the first session of recreation that day, either without knowing whether one of the inmates involved in the May 20 incident was in his wing or with full knowledge that C.W. was in the same wing.  No reasonable factfinder could conclude that the circumstances were such that C.W.'s placement in the same segregation unit as Plaintiff constituted deliberate indifference to a substantial risk to Plaintiff's safety.

## C.   Equal Protection

Plaintiff alleges that Defendants violated his equal protection and substantive due process rights by discriminating against him based on his custodial status and national origin. "The Supreme Court has limited the types of classifications that are subject to protection under the Equal Protection Clause to those that share "an immutable characteristic determined solely by the accident of birth," Frontiero v. Richardson, 411 U.S. 677, 686 (1973), or that have been subject to a "history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 28 (1973).  Classifications that are subject to protection under the Clause are limited to those such as "race, alienage, national origin, and gender." Gallagher v. City of Clayton, 699 F.3d 1013, 1018 (8th Cir. 2012).  Only "irrational

classification[s]" run afoul of the Equal Protection Clause.  U.S. Dep't of Agric. v. Moreno, 413 U.S. 528, 532-33 (1973).

Plaintiff presents no evidence in support of this claim.  As an initial matter, "custodial status" is not an immutable characteristic contemplated in the Equal Protection Clause.  Additionally, Plaintiff fails to reference any fact suggesting that any inmate of a different race or national origin received better treatment than he did on May 20 or 21, 2019, or any other day.  Even if any material fact remained in dispute as to whether Plaintiff was similarly situated to other inmates, he fails to point to any fact demonstrating that any Defendant acted with a discriminatory motivation towards him.

Rather, Plaintiff alleges that he was treated unfairly compared to his fellow inmates, Tyler Wicklund and Anthony Bowker, who were disciplined for events unrelated to those at issue here.[8]  Plaintiff fails to present any evidence demonstrating that he was similarly situated to Wicklund or Bowker, and Plaintiff's claims regarding them are baseless.  In any event, Plaintiff does not cite to any evidence suggesting a discriminatory purpose on Defendants' part.

Plaintiff also takes issue with the fact that he was the only inmate charged with attempted homicide following the May 20 fight.  MCF-Rush City policy states that "[a]ny offender who does an act which is a step toward the violation of a rule is guilty of an attempt to violate that rule and is subject to the full penalty for that rule."  (K. Peterson Decl. Ex. 4 at 6.)  The policy further describes homicide violations as, "[n]o offender shall

---

[8]     Plaintiff references Bowker in his Opposition Memorandum, but not in his Amended Complaint.

kill or contribute in any way to the death of another person." (Id. at 16.)  Only Plaintiff threw someone over a railing down to the next level.  This action could have resulted in J.B.'s death thus satisfying the requirement for an attempted-homicide charge.  Contrary to Plaintiff's argument, whether J.B. was injured is irrelevant, as the charge relates to Plaintiff's conduct, not J.B.'s health.  There are not disputes of fact as to whether Plaintiff was similarly situated to the other inmates involved in the May 20 attack.

Lastly, Plaintiff repeatedly insists that Defendants lied about the surveillance videos' contents, which he claims ostensibly violated his constitutional rights.  None of the arguments Plaintiff raises, which primarily consist of who struck whom and when, bear on Plaintiff's constitutional claims.  In any event, the Court has reviewed the videos and determined that Defendants' description of the videos is accurate.  Plaintiff claims that he "happened to push [J.B.] over the tier, with no evidence that it was done intentionally." (Pl's Opp'n Mem. at 5.)  The surveillance video unequivocally shows Plaintiff bending down to grab to J.B., hoisting him up and over the railing, obviously intending to throw him down to the level below.  The Court takes a dim view of Plaintiff's blatant mischaracterization of evidence.

Defendants' Motion is granted as to Plaintiff's equal-protection claim.

**D.    Plaintiff's Letter Request**

The Court reviewed Plaintiff's submission regarding James Thompson's declaration, and determines that any such evidence would have no material effect on Plaintiff's claims.  Thus, Plaintiff's request is denied as moot.

**CONCLUSION**

Accordingly, **IT IS HEREBY ORDERED that**:

1.     Defendants' Motion for Summary Judgment (Docket No. 166) is

        **GRANTED** and this matter is **DISMISSED with prejudice**; and

2.     Plaintiff's letter request (Docket No. 86) is **DENIED as moot**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**

Dated: <u>Thursday, September 29, 2022</u>

*s/ Paul A. Magnuson*
Paul A. Magnuson
United States District Court Judge

24